UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MOHAMED A. SEIF, Ph.D., | } | |
| Plaintiff, | } } } | |
| v. | } } | Case No.: 5:15-cv-02374-MHH |
| THE BOARD OF TRUSTEES OF ALABAMA A&M, et al., | } } } | |
| Defendants. | } | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mohamed E. Seif, Ph.D. is a tenured professor at Alabama Agricultural & Mechanical University. In this lawsuit, Dr. Seif alleges that the defendants discriminated against him because of his race, ethnicity, ancestry, and national origin. Dr. Seif asserts Title VII claims against the Board of Trustees of Alabama A&M. Dr. Seif asserts 42 U.S.C. § 1983 claims against Dr. Andrew Hugine, Jr., individually and in Dr. Hugine's official capacity as Alabama A&M's President; Dr. Daniel Wims, individually and in his official capacity as Alabama A&M's Provost and Vice President of Academic Affairs; and Dr. Cassandra Tarver-Ross, individually and in her official capacity as Alabama A&M's Director of Human Resources. (Doc. 20, p. 2).

1

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, the individual defendants ask the Court to dismiss Dr. Seif's § 1983 claims against them. (Doc. 22). For the reasons stated below, the Court grants in part and denies in part the defendants' motion to dismiss.

## I. STANDARD OF REVIEW

### A. Rule 12(b)(1) Standard

Rule 12(b)(1) enables a defendant to move to dismiss a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A defendant may present either a facial or a factual challenge to subject matter jurisdiction. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). If it is apparent from the face of the complaint that the plaintiff has pled facts that confer subject matter jurisdiction under a statute, then a court must deny a defendant's 12(b)(1) motion. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013). In conducting a facial analysis, a court must take the allegations of the complaint as true. *Houston*, 733 F.3d at 1335. In contrast, when a defendant mounts a factual challenge to subject matter jurisdiction, a district court may consider extrinsic evidence and weigh the facts to determine whether it may exercise jurisdiction. *Houston*, 733 F.3d at 1336.

### B. Rule 12(b)(6) Standard

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint against the "liberal

pleading standards set forth by Rule 8(a)(2)." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Generally, to survive a [Rule 12(b)(6)] motion to dismiss and meet the requirement of Fed. R. Civ. P. 8(a)(2), a complaint need not contain 'detailed factual allegations,' but rather 'only enough facts to state a claim to relief that is plausible on its face.'" *Maledy v. City of Enterprise*, 2012 WL 1028176, *1 (M.D. Ala. March 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (quoting *Twombly*, 550 U.S. at 555).

When evaluating a Rule 12(b)(6) motion to dismiss, a district court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *See Brophy v. Jiangbo Pharms. Inc.*, 781 F.3d 1296, 1301 (11th Cir. 2015). Therefore, in this opinion, the Court presents the allegations in the complaint in the light most favorable to Dr. Seif, recognizing that the defendants may dispute the allegations.

## II.   FACTUAL BACKGROUND

Dr. Seif is an Arabic-Egyptian male. (Doc. 20, ¶¶ 8, 34). Alabama A&M hired Dr. Seif in 2002. (Doc. 20, ¶ 9). Dr. Seif received tenure in 2006, and in 2007, Dr. Seif became the acting chair of the university's mechanical engineering department.

3

(Doc. 20, ¶ 9). In 2008, Alabama A&M named Dr. Seif the chair of the mechanical engineering department. (Doc. 20, ¶ 9).

When Dr. Seif became chair of the mechanical engineering department, the university had virtually no laboratory facilities. Alabama A&M now has six "well-equipped" laboratories that are in "excellent condition." (Doc. 20, ¶ 10). In 2011, Alabama A&M "significantly expanded" Dr. Seif's responsibilities when it placed the civil engineering department under his leadership, and Dr. Seif became the chair of both the mechanical engineering and civil engineering departments. (Doc. 20, ¶ 11). Dr. Seif also oversees the construction management department. (Doc. 20, ¶ 14).

According to Dr. Seif, he has "worked diligently to address all of the accreditation requirements" of the civil and mechanical engineering departments. (Doc. 20, ¶ 12). As a result of Dr. Seif's efforts, for the first time in Alabama A&M's history, the two programs obtained the maximum 6 years of accreditation. (Doc. 20, ¶ 12). Under Dr. Seif's leadership, enrollment in the mechanical engineering program has increased from 121 students in 2007 to 280 students today. (Doc. 20, ¶ 13). Dr. Seif contends that that "enrollment and [the] trajectory of enrollment increase" for the mechanical engineering department "is far better" than other engineering departments. (Doc. 20, ¶ 13).

After becoming chair of the mechanical engineering department in 2008, Dr. Seif helped develop new courses, labs, and innovative programs. (Doc. 20, ¶ 15). He participated in a number of "high level scholarly activities, . . . author[ed] []

publications in prestigious and high quality journals, . . . obtain[ed] certifications, and provid[ed] mentorship programs for students." (Doc. 20, ¶ 15). In 2013, Dr. Seif led a team of Alabama A&M students in a national NASA rocket building competition in which Alabama A&M placed first out of 40 universities. (Doc. 20, ¶ 15). Dr. Seif has secured 27 research grants which have resulted in more than $3 million in funding for Alabama A&M. (Doc. 20, ¶ 15).

Dr. Seif alleges that his base salary as chair of the mechanical and civil engineering departments is "substantially lower than the base salary" of the other two chairs within the College of Engineering who are Indian and Iranian. (Doc. 20, ¶ 16). According to Dr. Seif, his "certifications, licensure, number of theses supervised, number of undergraduate projects supervised, mentoring activities, and scholarly activities greatly exceed those" of the other two chairs. (Doc. 20, ¶ 16). In addition, Dr. Seif's efforts to address "prior accreditation weaknesses and deficiencies" contributed to the university's ability to obtain an official "ABET [a]ccreditation." (Doc. 20, ¶ 19).

In 2008, Dr. Juarine Stewart, Alabama A&M's interim provost, promised Dr. Seif that upon the university's receipt of "ABET accreditation" for the mechanical engineering department, she would recommend that the university increase Dr. Seif's base salary "to bring him in line" with other department chairs in the School of Engineering. (Doc. 20, ¶ 17). In November 2012, Dr. Seif spoke to Dr. Chance Glenn, Alabama A&M's Dean of Engineering, and asked about an increase in his base

5

salary. (Doc. 20, ¶ 18). Dr. Glenn advised Dr. Seif to "delay his request until the [u]niversity received the official ABET accreditation results" for the mechanical engineering program. (Doc. 20, ¶ 18). Dr. Glenn told Dr. Seif that his (Dr. Seif's) "strongest argument for a salary adjustment was the lack of equal pay between" Dr. Seif and the two other department chairs. (Doc. 20, ¶ 18).

In November 2013, Dr. Glenn and Dr. Stewart recommended Dr. Seif for a salary increase. (Doc. 20, ¶ 20). In December 2013, Dr. Wims denied the salary increase because he was waiting on the results of system-wide study before he could determine whether to approve any salary increases. (Doc. 20, ¶ 21).

On December 9, 2013, Dr. Seif filed an internal complaint and grievance based on unequal pay. (Doc. 20, ¶ 22). On February 17, 2014, Alabama A&M's human resources department advised Dr. Seif that the faculty grievance screening committee, by a unanimous vote, determined that Dr. Seif's unequal pay complaint was suitable for resolution through the university's grievance process. (Doc. 20, ¶ 22). On February 26, 2014, Dr. Seif received a letter from Dr. Tarver-Ross. (Doc. 20, ¶ 22). The letter listed the members of the university's grievance hearing committee and outlined the next steps in the process. (Doc. 20, ¶ 22). One day later, on February 27, 2014, Dr. Tarver-Ross mailed another letter to Dr. Seif. (Doc. 20, ¶ 22). In the letter, Dr. Tarver-Ross advised Dr. Seif that his complaint was not grievable despite the screening committee's vote. The letter dismissed Dr. Seif's unequal pay grievance. (Doc. 20, ¶ 22).

By letter dated April 4, 2014, a representative of Dr. Seif informed Dr. Hugine that Dr. Seif would appeal the university's determination with respect to the unequal pay grievance. (Doc. 20, ¶ 23). The letter advised Dr. Hugine of Dr. Stewart's and Dr. Glenn's promises that Dr. Seif's salary should be adjusted. The letter also demanded that Alabama A&M adjust Dr. Seif's base salary and compensate him comparably to the other department chairs. (Doc. 20, ¶ 23). Dr. Hugine did not respond to the April 4, 2014 letter. (Doc. 20, ¶ 24).

Dr. Seif alleges that Alabama A&M continues to pay him less than "similarly situated employees who are not of Egyptian national origin." (Doc. 20, ¶ 24). As a result, Dr. Seif contends that the defendants have discriminated against him "due his Arabic race, ethnicity, and ancestry." (Doc. 20, ¶ 34). In addition, according to Dr. Seif, associate professors who are not of Egyptian national origin are paid "substantially more" than Dr. Seif. (Doc. 20, ¶. 25). Based on these allegations, Dr. Seif asserts a 42 U.S.C. § 1981—via § 1983—race, ethnicity, and ancestry discrimination claim against Dr. Hugine and Dr. Wims in their individual and official capacities. Dr. Seif also asserts a § 1983 due process claim against Dr. Hugine, Dr. Wims, and Dr. Tarver-Ross in their individual and official capacities. Since Dr. Seif asserted these claims, the parties conferred to determine whether the university would hear Dr. Seif's original grievance associated with his unequal pay claim. The parties have not reached an agreement on this issue. (*See* Doc. 32).

### III. DISCUSSION

The defendants advance two substantive arguments in support of their motion to dismiss.[1] First, the defendants contend that the Eleventh Amendment bars Dr. Seif's official capacity claims against them. Second, the defendants maintain that Dr. Seif has not stated a claim for race discrimination or deprivation of his procedural due process rights. The Court addresses each argument in turn.

### B. Eleventh Amendment Immunity Bars Dr. Seif's Official Capacity Damages Claims but not Dr. Seif's Official Capacity Claims Seeking Prospective Injunctive Relief.

Dr. Seif's § 1983 claims for damages against the individual defendants in their official capacities are "functionally equivalent" to claims against the Board of Trustees. *Busby v. City of Orlando*, 931, F.2d 764, 776 (11th Cir. 1991); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (explaining that a suit for money damages against a state official in his or her official capacity "is not a suit against the official but rather is a suit against the official's office," and therefore, "it is no different from a suit against the State itself"). The Board of Trustees is immune from suit under the Eleventh Amendment. *Lassiter v. Alabama A&M Univ., Bd. of Trustees*, 3 F.3d 1482, 1485 (11th Cir. 1993), *vacated on other grounds*, 28 F.3d 1146 (11th Cir. 1994) (en banc) ("The district court correctly found that Lassiter's claims against the Board of Trustees of Alabama A&M are barred by the Eleventh

---

[1] The Court is not persuaded by the defendants' global argument that Dr. Seif's factual allegations fail to provide "any information of any kind as to the alleged act or omission attributable" to the defendants. (Doc. 22, p. 6). Dr. Seif's first amended complaint contains specific factual allegations that put the defendants on notice of the conduct that gives rise to Dr. Seif's claims.

Amendment."). Therefore, the Court will dismiss with prejudice Dr. Seif's § 1983 official capacity damages claims against the individual defendants. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("This [Eleventh Amendment] bar remains in effect when State officials are sued for damages in their official capacity"); *Lassiter*, 3 F.3d at 1485 ("To the extent that Lassiter seeks retroactive relief against Covington in his official capacity, the action is likewise barred by the Eleventh Amendment.").[2]

In contrast, the Court will allow Dr. Seif's official capacity claims for injunctive relief to proceed. "Under the doctrine enunciated in *Ex parte Young*, . . . a suit alleging a violation of the federal constitution against a state official in his official capacity for injunctive relief on a prospsective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 296, 298-99 (1997)). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Id.* at 646.

---

[2] Dr. Seif does not appear to challenge the defendants' arguments with respect to the official capacity damages claims. (*See* Doc. 30).

Dr. Seif has sued state officials in their official capacities, and he contends that he is entitled to a prospective salary adjustment. (Doc. 20, p. 16). The defendants do not dispute that Dr. Seif seeks prospective injunctive relief that fits within *Ex parte Young*. (*See* Doc. 12, pp. 7-11).[3] Rather, the defendants argue that Dr. Hugine is the only proper defendant against whom Dr. Seif may seek prospective injunctive relief because none of the other individual defendants control employment related decisions. (Doc. 22, pp. 7-11). Should the Court ultimately order a prospective salary adjustment, the Court understands that fewer than all of the individual defendants may be responsible for taking the steps necessary to provide that relief. If the defendants provide evidence that establishes that Dr. Hugine is the individual against whom an injunctive order would be directed, the Court will reconsider this issue. Such a determination is inappropriate at the motion to dismiss stage because the Court does not look beyond the complaint. Therefore, the Court will not dismiss Dr. Seif's official capacity claims for injunctive relief against Dr. Hugine, Dr. Wims, and Dr. Tarver-Ross.

**B.  Dr. Seif's First Amended Complaint States a Claim for Race Discrimination and Denial of Due Process.**

**1. § 1981 via § 1983 Race, Ethnic, and Ancestry Discrimination**

In count two of his amended complaint, Dr. Seif alleges that Dr. Hugine and Dr. Wims discriminated against him because of his race, ethnicity, and ancestry in

---

[3] The Eleventh Circuit appears to recognize front pay as a form of prospective relief. *See Taylor v. Texgas Corp.*, 831 F.2d 255, 256 (11th Cir. 1987) (referring to "prospective relief in the form of reinstatement or front pay").

violation of 42 U.S.C. § 1981, via § 1983, because Dr. Hugine and Dr. Wims did not pay him a salary comparable to other department chairs who are not Arabic. (Doc. 20, ¶¶ 16, 33-36).[4] The defendants argue that Dr. Seif's race discrimination claim fails to state a claim because Arabic is a national origin, not a race. (Doc. 22, p. 3, n. 3; *see also* Doc. 12, pp. 11-17). The defendants' position too narrowly construes what constitutes race discrimination under § 1981.

In *Saint Francis College v. Al-Khazarji*, 481 U.S. 604 (1987), the United States Supreme Court found that a person of Arabian ancestry may be protected from racial discrimination under § 1981. The Court stated that it had "little trouble concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." *Saint Francis College*, 481 U.S. at 613. According to the Court, "[s]uch discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." *Id.* The Court explained that on remand, if the plaintiff could "prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out of a case under § 1981." *Id.*; *see also e.g.*, Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008) (finding that the district court prematurely

---

[4] Dr. Seif properly asserts his § 1981 claim pursuant to § 1983. *See Baker v. Birmingham Bd. of Educ.*, 531 F.3d 1336, 1337 (11th Cir. 2008) ("Section 1981 does not provide a cause of action against state actors; instead claims against state actors or allegations of § 1981 violations must be brought pursuant to § 1983.").

dismissed a § 1981 race discrimination claim based on the plaintiff's Iranian ancestry); *Amini v. Oberlin College*, 259 F.3d 493, 503 (6th Cir. 2001) (reversing the district court's decision to dismiss an Iranian Muslim's § 1981 claim and stating that "[u]nder [*Saint Francis College*'s] conception of race, one can state a cognizable § 1981 claim if he can allege discrimination based on any of a number of ethnicities, including: German, Italian, Spanish, Russian, and 'Arab,' to name just a few").

Dr. Seif alleges that he is Arabic and Egyptian, and his base salary is "substantially lower than the base salary of the other two Chairs within the College of Engineering," one of whom is Indian and one of whom is Iranian. (Doc. 20, ¶ 16). Therefore, Dr. Seif contends that the defendants treated him differently because he is Arabic. At the pleading stage, Dr. Seif's allegations fit within the parameters of *Saint Francis College*.[5] Therefore, Dr. Seif's § 1981, via § 1983, race discrimination claim may proceed.

### 2. § 1983 Due Process

In count three of his amended complaint, Dr. Seif alleges that Dr. Hugine, Dr. Wims, and Dr. Tarver-Ross violated his procedural due process rights because the

---

[5] The Court is not persuaded by the defendants' arguments that Dr. Seif has not pleaded a prima facie case of race discrimination. (*See* Doc. 13, p. 13). To adequately state a claim under § 1981, Dr. Seif's "complaint need not allege facts sufficient to make out a classic *McDonnell Douglas* prima facie case." *See Surtain v. Hamlin Terrac Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015). "This is because *McDonnell Douglas*'s burden-shifting framework is an evidentiary standard, not a pleading requirement." *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). To the extent that the defendants argue that the two associate professors that Dr. Seif identifies may be inadequate comparators, Dr. Seif also identifies two department chairs who plausibly appear to be "similarly situated in all relevant respects." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004).

12

defendants did not permit a grievance hearing pursuant to the faculty screening grievance committee's vote. (Doc. 20, ¶¶ 37-40).

To state a claim under § 1983 for denial of procedural due process, a plaintiff must allege facts plausibly suggesting: "(1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir. 2006) (internal quotation marks and citation omitted). "Property interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts," and "[w]hether these sources create a property interest must be decided by reference to state law." *Id.* at 1348.

The defendants argue that Dr. Seif's procedural due process claim fails to state a claim because Dr. Seif has no contractually created right to a hearing for non-termination-related disputes. (Doc. 22, p. 17). According to the defendants, Alabama A&M's handbook and its policies do not create a binding express contract that is enforceable against the university. (Doc. 22, pp. 13-17). Even if this is so, the Court finds that Dr. Seif's § 1983 due process claim may proceed.

Alabama law recognizes "two kinds of implied contracts—those implied in fact and those implied in law." *Mantiply v. Mantiply*, 951 So. 2d 638, 656 (Ala. 2006) (internal quotation marks and citation omitted). "A contract implied in fact requires the same elements as an express contract, and differs only in the method of expressing mutual assent." *Ex parte Jackson Cty. Bd. of Educ.*, 4 So. 3d 1099, 1104 (Ala. 2008)

(internal quotation marks and citation omitted). Generally, implied contracts "arise in situations where there is a bargained-for exchange contemplated by the parties, but no overt expression of agreement." *Ellis v. City of Birmingham*, 576 So. 2d 156, 157 (Ala. 2001). "Contracts implied in law are more properly described as quasi or constructive contracts where the law fictitiously supplies the promise to prevent a manifest injustice or unjust enrichment, etc." *Mantiply*, 951 So. 2d at 656 (Ala. 2006) (internal quotation marks and citation omitted).

At a minimum, Dr. Seif's amended complaint states a claim for violation of procedural due process based on a contract implied in law. Dr. Seif alleges that an interim provost represented that upon the university's receipt of a particular accreditation, she would recommend Dr. Seif for a salary increase "to bring him line" with the other engineering department chairs. (Doc. 20, ¶ 17). The interim provost and the engineering dean recommended Dr. Seif for a salary increase in November 2013. (Doc. 20, ¶ 20). After Dr. Wims denied the request in December 2013, Dr. Seif filed an internal grievance. (Doc. 20, ¶¶ 21-22). On February 17, 2014, Alabama A&M's Office of Human Resources advised him that the faculty grievance screening committee voted unanimously that Dr. Seif's unequal pay complaint was suitable for resolution through the university's grievance procedures. (Doc. 20, ¶ 22). On February 26, 2014, Dr. Seif received a letter from Dr. Tarver-Ross listing the members of the grievance hearing committee and outlining the next steps of the process. (Doc. 20, ¶ 22). On February 27, 2014, Dr. Tarver-Ross mailed a letter that

14

contradicted the previous letter, advised Dr. Seif "that the matter was not grievable," and dismissed Dr. Seif's equal pay grievance without a hearing. (Doc. 20, ¶ 22). These facts, if proven, may entitle Dr. Seif to relief under an implied in law contract theory "to prevent a manifest injustice or unjust enrichment." *See Mantiply*, 951 So. 2d at 656. Accordingly, Dr. Seif's § 1983 procedural due process claim may proceed.

## IV. CONCLUSION

For the reasons outlined above, the Court **GRANTS** the defendants' motion to dismiss as to Dr. Seif's official capacity damages claims against the individual defendants. The Court **DENIES** the defendants' motion to dismiss as to Dr. Seif's individual capacity damages claims and official capacity claims that seek injunctive relief against Dr. Hugine, Dr. Wims, and Dr. Tarver-Ross.

**On or before August 9, 2017**, the parties shall please confer and file a Rule 26(f) report.

**DONE** and **ORDERED** this July 28, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE